## ADWOOD CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19202.    Promulgated August 25, 1950.

*Jackson L. Boughner, C. P. A.*, for the petitioner.
*Wesley A. Dierberger, Esq.*, for the respondent.

#### OPINION.

MURDOCK, *Judge:* The Commissioner determined deficiencies **for** fiscal years ending May 31st as follows:

| Year | Income tax | Declared value excess profits tax | Excess profits tax |
|------|-----------|-----------------------------------|--------------------|
| 1942 | $6,583.67 | | |
| 1943 | 5,811.09 | $324.75 | $20,033.30 |
| 1944 | | 910.27 | 27,475.17 |

The petitioner has alleged that the Commissioner erred (1) in holding that the transaction whereby the petitioner acquired its hotel property does not come within the provisions of section 112 (b) (3), 112 (g) (1) (C), and 112 (b) (5), so that it is entitled to use as its basis for depreciation the cost of the property to Savoy Hotel Co. less depreciation to June 11, 1941, and (2) in determining that the cost basis is only $400,000. The facts in the record are there by agreement of the parties and the facts thus agreed upon are adopted as the findings of fact.

The petitioner is a Michigan corporation. The returns were filed with the collector of internal revenue for the first district of Michigan.

Harry L. Pierson and Harriet P. Taylor, hereafter called Piersons, owned property in Detroit. They leased this property on August 1,

1925, for 99 years to Ray Spitzley and Paul L. Kamper. The lessees agreed to erect a new hotel building on the premises. The annual rent for the first 10 years was $37,200, after which it was to be larger amounts. The Piersons agreed to join with the tenants in the execution of a mortgage covering the land and buildings, to be drawn so that the Piersons would not be personally liable. The lessees were to pay all taxes and special assessments.

The lease provided that if default occurred, the Piersons could, after proper notice and the elapse of 3 months, declare the lease terminated and take possession, and upon termination, all improvements standing on the premises were to belong to the Piersons.

The lessees assigned the lease to the Savoy Hotel Co. on October 20, 1925.

The Savoy Hotel Co. and the Piersons executed a trust indenture to secure first mortgage bonds in the principal amount of $1,450,000. It was provided in Article VI, Section 1, that upon the occurrence of any events declared therein to constitute default on the part of Savoy Hotel Co. and the Piersons to carry out the terms of the mortgage, then the trustee could, by notice to the Savoy Hotel Co. and the Piersons, declare the principal of the mortgage to be due immediately, "provided, however, thirty (30) days' notice in writing of any such declaration of default shall be given the Owners by registered mail at their last known address." It was provided in Article VI, Section 7, that in case of default "the Owners shall in each instance be given thirty days' notice in writing of the intention of the party or parties entitled to do so, to declare the principal of any bonds secured by this mortgage and then outstanding to be due and payable in advance of their maturity, or to foreclose this mortgage, or sell or convey or otherwise dispose of the Owners' interest in the property mortgaged, or to take possession of the mortgaged premises, or to take any other action for the enforcement of this mortgage, before any steps looking to such declaration, foreclosure, conveyance, disposition, or taking of possession or enforcement are taken, and the Owners may, but shall not be required so to do, do whatever may be necessary to remedy and remove such default or defaults; and in case the Owners elect to and do remedy and remove such default or defaults within the above period of 30 days, or within such further period of grace as may be allowed them by the terms of this mortgage or otherwise, then in such case the principal of any bonds secured hereby and then outstanding shall not be declared to be due and payable in advance of their maturity * * * nor shall any other action be taken for the enforcement of this mortgage because of such default or defaults."

The Savoy Hotel Co. in April 1929 was having financial difficulties and was unable to pay the rent. The Piersons, on June 12, 1929, served upon the tenant a notice to quit.

The Piersons entered into a written agreement with the Savoy Hotel Co. and Emily K. Kamper on July 1, 1929. The agreement provided that Emily would advance sufficient funds to cover the payments due on the first mortgage on July 1, 1929, and the Piersons would waive all past-due rent and all rent for the remainder of 1929. The agreement further provided that the Piersons could take possession in case the Savoy Hotel Co. failed to pay the trustees the interest falling due after July 1, 1929.

The Savoy Hotel Co. failed to make the required payments and the trustee served notice dated December 13, 1929, on the Savoy Hotel Co. and the Piersons, in accordance with Article VI, Section 7, of the trust indenture reciting defaults and stating their intention to declare all principal due immediately, to take possession, and to foreclose the mortgage. The Piersons served a 7-day notice to quit on the Savoy Hotel Co. on December 26, 1929, and took possession of the premises on January 6 1930.

The Savoy Hotel Co. filed a bill of complaint in a Michigan court on January 8 asking for restoration of possession. of the property. The Piersons filed an answer and a cross-bill requesting that the lease be decreed to be lawfully cancelled and terminated. The court entered an opinion on January 28, 1930, in which it referred to the agreements and acts of the parties and then said:

It is the conclusion of the Court:

1. That the entry of January 6, 1930. was a peaceable one, and that the same was made in accordance with the provisions of the agreement of July 1st, 1929.

2. That by such entry the landlords secured the right of possession for the defaults which had occurred, but that the original ninety-nine year lease, dated August 1st, 1925, contemplated a ninety day delay after default, before the right to terminate could accrue, and that this provision still remained in force and effect, and that therefore it is inequitable for the lessors to claim a title and extinguishment of the equity of the lessee without giving the lessee an opportunity to reinstate itself.

3. He who seeks equity must do equity. The landlords have invoked the aid of a court of equity to confirm them in their title. This confirmation will be granted, subject to the right on the part of the plaintiffs to reinstate themselves within a period of ninety days from the 26th day of December, 1929. Such reinstatement will consist in the payment of all the items mentioned as being in arrears, and the restoration of the plaintiff to good standing with relation to all the mortgages. In the event that the plaintiff company has complied with these conditions, the defendant shall account to the plaintiff for all of the operating profits during the period that the defendants have been in possession, and proceedings may be had on the foot of this decree for such an accounting upon appropriate petition by the plaintiffs. Upon compliance with the foregoing, plaintiff shall also be entitled to be restored to possession of the property.

A decree may be entered accordingly, with costs in favor of defendants and cross plaintiffs.

A decree was entered on February 3, 1930.

A Michigan court, on February 6, 1930, appointed a receiver for the Savoy Hotel Co. upon an action filed by stockholders on January 15, 1930. The report of the receiver, stating that the company had assets of $629.13, was approved on October 8, 1930. It was never able to make up the defaults and reinstate the lease.

The Piersons, on March 1, 1930, agreed to turn over to the trustee the daily receipts from the operation of the hotel and the trustee was to reimburse them for the operating expenses. A Committee for the bondholders of the First Mortgage Bonds was formed on February 3, 1930. The bondholders negotiated with the Piersons concerning a possible reorganization.

This notice required by Section 1 of Article VI of the trust indenture, was served on the Piersons and the Savoy Hotel Co. on May 19 and 20, 1930, declaring the principal of all bonds payable immediately. Foreclosure proceedings were begun in June 1930. The court found that $1,645,621.42 was the debt owed on the first mortgage and authorized the sale of the premises forthwith unless the same was paid. A decree was entered on October 26, 1931. No adequate bid was received and there was no sale until June 11, 1941.

The property was operated, beginning in January 1930. first by the Piersons and then by a hotel management company and later by the trustee. The premises were leased to Detroit Hotels, Inc., in October 1933 under terms approved by the trustee and the Bondholders Committee. The lease was to run until November 1, 1943.

The following amounts were owing as of March 1, 1941, for advances made during the period after January 1930: (a) To the trustee for taxes and operating expenses $103,481.97, including interest to April 25, 1933, in the amount of $6,817.67; (b) to the Piersons for advances to the trustee for operating expenses $36,000; (c) to the Piersons for taxes advanced June 20, 1936, $56,242.60. $83,164.30 of item (a) and all of item (c) bear interest at 6 per cent per annum. The foregoing amounts were a lien on the mortgaged premises prior to a lien of the first mortgage.

A plan of reorganization developed by the Bondholders Committee in conjunction with the Piersons and the trustee was approved by the Public Trust Commission of Michigan on April 18, 1941. The holders of the bonds were notified of that fact on May 9, 1941. The plan provided for the incorporation of the petitioner which was to purchase the property on foreclosure sale for the benefit of the first mortgage bondholders to whom stock was to be issued in the proportion of one share for each $10 par value of bonds. If it was successful in buying the property, then the Detroit Trust Co., the trustee. agreed to accept $110,000 "in full settlement of the amount due it for its advances aforesaid and for the surrender for cancellation of Fifty

Thousand Dollars ($50,000.00) face amount of first mortgage bonds which it owns" and the Piersons agreed to accept in satisfaction of their advances $65,000 and 27,000 shares of stock of the petitioner. The plan also provided that if the petitioner was the successful bidder, it would acquire the property subject to the liens of the Piersons and the Detroit Trust Co. because the plan could not be completed until the period of redemption expired which was six months after sale. The petitioner was to borrow $200,000 on a first mortgage on the property and was to use the net proceeds of the loan to make the payments to the Detroit Trust Co. and the Piersons.

The petitioner was organized and purchased the property at a foreclosure sale on June 11, 1941. The bid price was $400,000. It was paid as follows: (1) First Mortgage Bonds of the total face value of $1,408,000 were deposited and accepted, representing the sum of $143,849.96; (2) cash in the amount of $4,942.84 for court expenses and for distribution to nondepositing bondholders; (3) the Detroit Trust Co. and the Piersons permitted their advances in the total amount of $251,207.20 to be credited on the bid price and agreed to look solely to the petitioner for payment.

The Detroit Trust Co., the Bondholders' Committee, the petitioner, and the Piersons had entered into an agreement on June 10, 1941, providing that if the petitioner was the successful bidder, it should issue to the Committee certificates for the stock represented by the deposited bonds, including the stock allocable to the $50,000 par value of bonds owned by Detroit Trust Co. This stock was to be pledged as additional security for the advances by the Trust Company and the owners. It also provided that the Trust Company would "accept $110,000 cash in full payment of the amount due it under the decree as amended and supplemented and in addition will surrender the $50,000 par value of bonds which it owns, together with any stock of [petitioner] representing said bonds" and the petitioner was to pay the Piersons $65,000 and deliver to them 27,000 shares of stock.

A deed to the premises was delivered to the petitioner on December 11, 1941, upon expiration of the statutory period of redemption. The petitioner borrowed $200,000 on a mortgage, paid the Detroit Trust Co. $110,000 and paid the Piersons $65,000.

The holders of $6,500 of the total bonds outstanding of $1,450,000 objected to the plan and were paid in cash.

The petitioner, upon completion of the plan, had outstanding 172,000 shares, 135,800 of which were issuable to the depositing bondholders and 27,000 to the Piersons.

The Commissioner, in determining the deficiency, stated that the transaction whereby the petitioner acquired the hotel property does not come within the provisions of section 112 (b) (3), 112 (g) (1)

(C), or 112 (b) (5) of the Internal Revenue Code and, therefore, the basis of the property to the petitioner is the cost thereof, $400,000, of which he allocated $290,000 to buildings and allowed depreciation thereon based upon a useful life of 33⅓ years from June 11, 1941.

The petitioner contends that it is entitled to use the basis of the Savoy Hotel Co. for the purpose of computing depreciation on its hotel building. Section 113 (a) (7) entitled "Transfers to Corporation" provides that "If the property was acquired * * * in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the years in which the transfer was made." The petitioner acquired the property in 1941. No gain or loss of a transferor corporation is recognized if it transfers property, pursuant to a reorganization, solely in exchange for stock of another corporate party to the reorganization. Section 112 (g) (1) (C) provides that a reorganization means, *inter alia*, "the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded." The petitioner contends that those provisions apply and give to it the basis which the hotel property had in the hands of the Savoy Hotel Co.

The Savoy Hotel Co. was the assignee of a 99-year lease of the property. The lease provided that upon its termination for any cause, the improvements on the property were to go to the Piersons, the lessors, and the owners of the fee. The Savoy Hotel Co. lost every interest which it had in the building in 1930 when the lease was terminated by the order of the Michigan court. That closed the transaction for the tax purposes of the Savoy Hotel Co. The tax consequences of that loss of the hotel building by the Savoy Hotel Co. were determinable at that time under the Revenue Act of 1928. The Savoy Hotel Co., when it came to file its tax return for 1930, was in position to claim a loss of its entire remaining basis on the hotel property. That loss would have been deductible under section 23 (f) of the Revenue Act of 1928. The basis for the loss would be the same as that provided in section 113 for determining loss from the sale or other disposition of property. Section 23 (g). The basis of the Savoy Hotel Co. for that property under section 113 (a) was the cost of the building to the Savoy Hotel Co., less depreciation, since none of the exceptions of that section applies. The Savoy Hotel Co.

did not sell or exchange the property. Consequently, its loss was not from a sale or exchange, and none of the nonrecognition provisions of section 112 would apply. Furthermore, no reorganization of the Savoy Hotel Co. took place which might have been the basis for failing to recognize its loss. The petitioner did not acquire the property until more than 11 years later. The tax consequences to the Savoy Hotel Co. resulting from the termination of the lease in 1930 would not remain undetermined and inconclusive until the foreclosure sale in 1941. *Sanford & Brooks Co.* v. *Burnet*, 282 U. S. 359. No reasonable interpretation of the Revenue Act of 1928 could be made under which the loss of the Savoy Hotel Co. would not have been fully recognized and deductible on its return for 1930. The petitioner did not acquire the building from the Savoy Hotel Co. through a reorganization and furthermore the Savoy Hotel Co. basis was exhausted in its right to a 1930 loss deduction.

The situation might have been quite different if the Savoy Hotel Co. had not lost its entire interest in the building due to the termination of the lease in 1930. If it had owned the fee, for example, and the sale on foreclosure had not taken place until 1941, then it would not have lost its property prior to the sale, there would have been no disposition of the property in 1930 constituting a closed transaction for tax purposes, and the possibility of a reorganization in 1941 would have remained. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179. But the actual situation was entirely different due to the fact that the Savoy Hotel Co. lost its entire interest in the hotel when the lease was cancelled in 1930.

This case is not distinguishable in principle from *Bondholders Committee, Marlborough Investment Company First Mortgage Bonds* v. *Commissioner*, 315 U. S. 189, in which the Court held there was no carry-over of basis from the original mortgagor. There the mortgagor no longer had title to the property when the foreclosure sale took place. Instead, the title at the time of the foreclosure sale was in a different owner who held the title subject to the mortgage. Here a similar situation developed, although by reason of somewhat different events. The Savoy Hotel Co. no longer held any interest in the property at the time of the foreclosure and had not held any interest for over a decade. Instead, the title was in the Piersons who held it subject to the mortgage. The fact that the notice provided in Article VI, Section 7, of the trust indenture had been given on December 13, 1929, while the Savoy Hotel Co. still had an interest in the property, does not distinguish the cases. The Piersons, after having received that notice, terminated the lease, held the property subject to the mortgage, and had the right under the trust indenture to remove the defaults. Thus the equity in the hotel did not shift to the mort-

gagees, they did not obtain effective command over its disposition, and there was no establishment of any priority of the mortgagees over the Piersons on December 13, 1929. Cf. *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra*. Those events occurred, if ever, at a later time, definitely after the Savoy Hotel Co. had lost its interest in the property. Consequently, the *Marlborough Investment Company* decision is authority for holding here that there was no reorganization within the meaning of section 112 (g) (1) (C) since the Savoy Hotel Co. did not exchange any of its properties to the petitioner and the petitioner did not acquire its properties from the Savoy Hotel Co. in exchange for its voting stock. It follows that the petitioner does not take the Savoy Hotel Co. basis.

The petitioner relies upon *Warwick Hotel, Inc.* v. *United States*, 69 Fed. Supp. 242, which was affirmed 158 Fed. (2d) 961, as authority for the proposition that this case is distinguishable from the *Marlborough Investment Company* case, *supra*. A predecessor of the Warwick Hotel, Inc., had placed a first and second mortgage on its hotel premises. Both mortgages were in default in 1931, but the second mortgagees beat the first mortgagees to a foreclosure. A foreclosure of the second mortgage resulted in the sale of the property on February 2, 1932, subject to the first mortgage. Foreclosure under the first mortgage was started on February 15, 1932. The then owner of the property conveyed title to the Committee for the Bondholders under the first mortgage on May 19, 1932. Thereafter, Warwick Hotel, Inc., was organized and acquired the property as a result of the foreclosure sale under the first mortgage. Apparently the question there was whether the new corporation could use as its basis for depreciation the basis of the mortgagor. The District Court said:

It seems clear that the proceedings taken under the first mortgage, standing alone, constitute a "reorganization" under the Statute. * * * But the Government says that the proceedings taken under the second mortgage bring the case under the rule laid down in *Marlborough House* v. *Commissioner*, 315 U. S. 189 * * * and that that case is controlling.

It concluded that the *Marlborough* case was not controlling because the facts were "radically different." The Circuit Court held:

We agree with the court below that the proceedings taken under the first mortgage constituted a reorganization under the statute and that the *Bondholders Committee, Marlborough Investment Company* v. *United States*, 315 U. S. 189 * * * is not applicable.

It did not discuss the question of whether the prior foreclosure of the second mortgage might have brought the case within the *Marlborough Investment Company* case, which question seems to have been the only one which concerned the court below. If the *Warwick Hotel, Inc.*, case could be distinguished from the *Marlborough Investment* case, it could likewise be distinguished from the present case. But,

in any event, *Warwick Hotel, Inc.*, does not state any convincing reason for deciding the present case for the petitioner.

The petitioner argues in its brief that it is entitled to the basis of the bondholders because of the application of sections 112 (b) (5) and 113 (a) (8). It contends that the bondholders became, for practical purposes, the owners of the property in 1929 and transferred it to the petitioner in 1941 in a transaction coming within section 112 (b) (5). It "found no cases directly on the point." Although the petitioner mentions section 112 (b) (5) in its petition, it did not there indicate in any way that it was going to make the argument which it now makes in its brief and it is difficult to see how any such issue has been raised by the pleadings. Nevertheless, the Commissioner meets the petitioner's argument and contends that section 112 (b) (5) does not apply.

The equitable owners of the property just prior to the foreclosure sale were not only the bondholders, including the Detroit Trust Co., but also the Piersons and the Detroit Trust Co. by reason of the advances made for the operation of the hotel. The advances gave those latter creditors a claim superior to the claims of the bondholders. Actually none of those creditors transferred the property to the petitioner. Instead, there was a foreclosure of the mortgage and the petitioner bought the property at the foreclosure sale, thus depriving the Piersons of their title. Furthermore, if the view were to be taken that the property was transferred to the petitioner by the equitable owners in exchange for the stock of the petitioner, nevertheless, the property was not received solely in exchange for stock or securities of the petitioner and the stock received by each transferor was not substantially in proportion to his interest in the property prior to the exchange. The transferors under that theory were not the bondholders alone but included, in addition, the Piersons and the Detroit Trust Co. A substantial amount of cash was paid for the property, the Detroit Trust Co., which had made advances and was also a bondholder, receiving cash alone and the Piersons receiving both cash and stock. The petitioner would apparently recognize as the transferor some entity or group which would not include the Piersons and the Detroit Trust Co., and argues that it merely assumed the liability of that transferor to the Piersons and the Detroit Trust Co., but that argument is not supported by the facts of the case. The Piersons were transferors and there was no liability of any other transferor to the Piersons which the petitioner assumed. The same is true in the case of the Detroit Trust Co. They both had a prior lien on the hotel property for money advanced and would have been entitled to a part of the amount bid and paid for the property in the foreclosure. However, they agreed that the amount owing to them should be credited on the purchase price provided the petitioner

would issue 27,000 shares of its stock to the Piersons and pay in cash $65,000 to the Piersons and $110,000 to the Detroit Trust Co. which also tossed in its $50,000 in bonds. Section 112 (b) (5) does not fit such a transaction. Furthermore, the record does not show what the basis of the bondholders was for the building or how much of it was left on June 11, 1941.

The petitioner in its brief also mentioned sections 112 (b) (10) and 113 (a) (22), but clearly no issue involving those sections has been raised in the pleadings. Consequently, no consideration will be given to any such issue.

The petitioner contends as an alternative to the first issue that the cost of the property to it was not $400,000, as determined by the Commissioner, but $651,207.20. It argues that the price at the foreclosure sale was $400,000 and that the petitioner, in addition, paid $251,207.20 to the Detroit Trust Co. and the Piersons for advances which they had made. The evidence shows quite clearly, however, as the Commissioner contends, that the amounts owed by the petitioner to the Detroit Trust Co. and the Piersons were not in addition to the $400,000 foreclosure sale price but were credited as a part of that price and later the petitioner paid a lesser amount to discharge its obligation. It did not pay $400,000 plus $251,270.20 but actually paid ($400,000 minus $251,207.20) plus $175,000, or $323,792.80. The petitioner argues in this connection that the cost of the property was paid in stock of the petitioner, the cost is the value of the stock, the value of the stock is the value of the property, and the value of the property was $651,207.20. The evidence does not show that the value of the property was any more than $400,000 or that the Commissioner erred in determining that $290,000 was the portion of the total cost allocable to the building.

*Decision will be entered for the respondent.*