Charles Chagi and Thelma Chagi v. Commissioner.
Chagi v. Commissioner
Docket No. 656-68.
United States Tax Court
T.C. Memo 1970-106; 1970 Tax Ct. Memo LEXIS 252; 29 T.C.M. (CCH) 483; T.C.M. (RIA) 70106; May 7, 1970, Filed Willard D. Horwich, 9107 Wilshire Blvd., Beverly Hills, Calif., for the petitioners. Norman H. McNeil, for the respondent. 484 FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined that petitioners are each liable as a transferee of the assets of Emarcee Corporation to the extent of $4,577.90 in income tax for the taxable year ended June 30, 1961, plus interest in the amount of $1,403.74, and also determined that there is an overassessment for the taxable year ended June 30, 1962, in the amount of $107.90. At issue is whether petitioners are liable, and if so to what extent, as transferees of the Emarcee Corporation. Findings of Fact Some of the facts were stipulated, and the stipulation of facts and exhibits attached thereto are found accordingly. Petitioners *253 are Charles Chagi ("Charles") and Thelma Chagi ("Thelma"), husband and wife. At the date the petition herein was filed petitioners resided in Los Angeles, California. The merits of the transferor's liability for Federal corporation income tax are not at issue. The agreed deficiency in income tax of Emarcee Corporation ("Emarcee") for the taxable year ended June 30, 1961, plus accrued interest, in the respective amounts of $4,577.90 and $1,403.74, was assessed by respondent on August 5, 1966. An overassessment for the taxable year ended June 30, 1962, in the amount of $107.90 was scheduled by the respondent on August 18, 1966, as a credit against the $5,981.64 assessment made August 5, 1966. The then balance due, $5,873.74, was not paid after billing and remains unsatisfied to date. Emarcee's income tax return for the taxable year ended June 30, 1961, was filed December 18, 1961. Thereafter, on October 27, 1964, December 8, 1965, and March 30, 1966, agreements successively extending the period of limitations upon assessment to December 18, 1965, June 30, 1966, and December 31, 1966, were executed by Charles on behalf of Emarcee and by respondent's representatives. On December 5, 1967, respondent *254 mailed duplicate original statutory notices of transferee liability to Charles and Thelma with respect to the deficiency in the amount of $4,577.90 for Emarcee's taxable year ended June 30, 1961. In the same notice respondent credited Charles and Thelma each with an amount of $107.90 representing an over-assessment for Emarcee's taxable year ended June 30, 1962. The balance sheet attached to the Federal income tax return of Emarcee for fiscal year July 1 to December 26, 1962, stated that on July 1, 1962, Emarcee had cash in the amount of $2,000, an account receivable of $18,980, and a partnership equity. Another balance sheet attached to the same return stated that on December 26, 1962, Emarcee held no assets. The return to which the balance sheets were attached was signed by Charles as president of Emarcee. The aforesaid item of $2,000 resulted from a check in that amount drawn on January 1, 1961, upon Emarcee's account at California Federal Savings and Loan Association. The certified public accountant who prepared the income tax returns and cash records journal of Emarcee did not know the purpose for the disbursement. He therefore established a "Special Account" for said amount. *255 He intended the account to be a suspense item. The aforesaid receivable arose from a series of transactions between Emarcee and State Tire, Inc. ("State Tire"). The latter is engaged in the business of selling automotive tires. Since its incorporation Charles has been majority shareholder as well as its president. During the period July 1, 1960, to June 30, 1961, the books of Emarcee indicate advances to State Tire of $65,900 and repayments of $46,920, leaving an apparent net balance due Emarcee of $18,980. Charles wrote the checks by which Emarcee advanced funds to State Tire. These advances were often treated by the parties as wash transactions. The inter-corporate advances served as a vehicle to maintain the bank balances of State Tire. On various occasions Charles personally lent money to State Tire. Charles sometimes acquired these funds from Emarcee. The books of account of State Tire for 1961 and 1962 do not reflect an account payable to Emarcee. On February 19, 1957, Emarcee acquired from petitioners a parcel of land located near the corner of Sepulveda and Victory Boulevards in Van Nuys, California. On November 21, 1960, Emarcee conveyed an undivided one-half interest *256 in the Sepulveda property to Nathan and Mary Kramer. Emarcee reported the transaction as a sale for $72,500. Thereafter, Emarcee and the Kramers operated said property as the Emarcee-Kramer partnership. 485
On December 19, 1962, Emarcee deeded its undivided one-half interest in the aforesaid parcel of real estate to Charles as a distribution in total liquidation and redemption of its outstanding stock. The net value of the property exceeded the Federal income tax liability of Emarcee. Emarcee had been authorized to make the distribution at a special meeting of its board of directors on November 1, 1962. The minutes of that meeting state in part: The Chairman announced that it would be in the best interests of this corporation to voluntarily dissolve same; that the sole asset of the Corporation, to wit, real property located at the corner of Victory and Sepulveda Boulevard, Van Nuys, California, be distributed to Charles Chagi, the sole shareholder of this Corporation, in consideration of the cancellation of his shares; * * * Petitioners owned as community property all the outstanding stock of Emarcee at the time of its dissolution in 1962. Opinion The sole issue for *257 our decision is the extent, if any, of petitioners' liability as transferees of Emarcee. Upon the dissolution of Emarcee in 1962 Charles received a parcel of land in consideration of the cancellation of his shares. These shares were held in Charles' name but were community property. Petitioners do not dispute the amount of the liability of Emarcee nor that the value of the parcel distributed in liquidation of Emarcee exceeded the amount of that liability. Petitioners raise three defenses against respondent's assertion that they are liable as transferees of Emarcee. First, they contend that the statute of limitations bars assessment of the transferee liability. By agreement Emarcee and respondent extended the period of limitations to December 31, 1966. Respondent in fact made the assessment against Emarcee on August 5, 1966. Respondent mailed his statutory notice of liability to petitioners on December 5, 1967. Thus, respondent sent his statutory notice to petitioners more than one year after the actual assessment against Emarcee but less than one year from the expiration of the period for assessment as extended by execution of timely waivers. Section 6901(c)(1) [1] provides that *258 the period of limitations for assessment of liability of a transferee shall be "within 1 year after the expiration of the period of limitation for assessment against the transferor." It has been long established that the period of limitations against the transferee begins to run from the expiration of the statutory period in which the assessment might be made against the transferor rather than from the actual assessment. Commissioner v. Gerard 78 F. 2d 485 (C.A. 9, 1935), affirming 28 B.T.A. 236 (1933); Will T. Caswell 36 B.T.A. 816, 827 (1937). [2] Accordingly, respondent's assessment of transferee liability against petitioners was timely since it occurred within one year of December 31, 1966, the date upon which the period of limitations expired as to Emarcee. Petitioners' second defense is that Emarcee was not made insolvent by the distribution of the parcel to Charles. To establish transferee liability respondent has the burden of proving, inter alia, that the transferor was insolvent or *259 the transfer left the transferor insolvent. Louis Lesser 47 T.C. 564, 586 (1967). Respondent introduced three exhibits to make out a prima facie case that the liquidating distribution of the aforesaid parcel left Emarcee insolvent. One exhibit was the balance sheets attached to Emarcee's final Federal income tax return. One balance sheet stated that Emarcee had no assets on December 31, 1962. The first page of the same return stated that Emarcee conducted no business activity during the six months preceding the dissolution. Another exhibit was the minutes of a special meeting of the board of directors of Emarcee. The meeting was held on November 1, 1962. Expressing a desire to dissolve Emarcee, the directors declared at the meeting that the sole corporate asset was the aforesaid parcel subsequently distributed to Charles. The third exhibit introduced by respondent was the books of account of State Tire for 1961 and 1962. These books do not reflect an account payable to Emarcee. By these exhibits we think respondent made out a prima facie case and discharged his initial burden to show that Emarcee was rendered insolvent by the disposition of the parcel to Charles. In *260 reaching this conclusion we have especially looked to the fact that Charles, together with his 486 accountants, prepared and signed the balance sheets which became an integral part of Emarcee's final income tax return. Our stress in this case on the balance sheets attached to Emarcee's final return likens the instant case to the Court's earlier decisions in Sidney Kreps, 42 T.C. 660 (1964), affd. 351 F. 2d 1 (C.A. 2, 1965); and Archie A. Swinks, 51 T.C. 13 (1968). The petitioner in Kreps denied liability as transferee in part on the grounds that the transferor was not insolvent at the time of the transfers nor was thereby rendered insolvent. At the time of trial most of the original books and records of the transferor were not available. This Court therefore fore looked to other evidence, principally the balance sheets attached to the transferor's corporation income tax returns. Our opinion stressed, "Petitioner not only had access to such balance sheets but had the advantage of having prepared and signed the return of which they were an integral part." Sidney Kreps, supra at 670. Once respondent has made out a prima facie *261 case the burden of going forward with the evidence shifts to petitioners. Sidney Kreps, supra; Meyer Fried, 25 T.C. 1241 (1956); and Edward H. Garcin, 22 B.T.A. 1027, 1036 (1931). The Second Circuit stated in Kreps v. Commissioner, 351 F. 2d 1, 10 (C.A. 2, 1965), affirming 42 T.C. 660 (1964): In the present case, for example, once the Commissioner introduced Metropolitan's balance sheets and added the liability due to the recomputed tax, the burden of going forward shifted to the petitioner to show that Metropolitan had accounts receivable not represented on its books and that at the critical dates, the conclusion of each fiscal year, they amounted to enough to make Metropolitan solvent. In the present case the petitioner failed to discharge this burden and thus the Tax Court properly held for the Commissioner on the basis of the latter's computations. After respondent had made a prima facie case, petitioners saw fit not to produce any witnesses or material exhibits. [3] Charles, in fact, appeared only as respondent's own witness. [4] Charles' testimony should have been of utmost importance in establishing petitioners' *262 position. The essence of petitioners' position in this case is that the distribution of the parcel of real estate did not render Emarcee insolvent. Petitioners insist that Emarcee still held an account receivable from State Tire in the amount of $18,980 as well as another asset of $2,000. As regards the alleged receivable, we note that Charles was the sole shareholder of the creditor corporation, Emarcee, as well as president and principal shareholder of the debtor corporation, State Tire. He wrote the checks by which Emarcee advanced funds to State Tire. He regarded some of these advances as merely part of a wash transaction. If anyone, he should be the person most knowledgeable about what happened to the receivable. This is especially true in view of the large amount of the receivable. Other than the parcel of land, it was Emarcee's only significant asset. It is difficult to accept Charles' testimony to the effect that he did not recall "anything at all" about the alleged receivable or the $2,000 item. *263 In view of Charles' repeated negative responses, as well as the failure of petitioners to introduce even one witness or a single pertinent exhibit, we conclude that petitioners did not overcome respondent's prima facie case that Emarcee's last remaining asset was the aforesaid parcel of land and by its distribution to Charles, Emarcee was rendered insolvent. Petitioners' third defense is that respondent did not attempt to collect the tax from the transferor prior to his initiating proceedings against petitioners.[5] Since Emarcee did not have any assets remaining after distribution of the real estate parcel, such an effort by respondent would have been useless. Respondent therefore acted properly 487 in proceeding directly against petitioners. Coca-Cola Bottling Company of Tucson, 37 T.C. 1006, 1013 (1962), affd. 334 F. 2d 875 (C.A. 9, 1964). *264 Decision will be entered for the respondent. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954. ↩
2. For a more recent opinion see Anne Davis T.C. Memo. 1964-244↩.
3. Petitioners did introduce three exhibits consisting of Emarcee's balance sheets for fiscal years ending June 30, 1957, 1958, and 1959. Their only purpose was to prove that the parcel of land did not exceed the amount of Emarcee's tax liability. Petitioners later conceded this issue on brief. ↩
4. Because Charles appeared as a hostile witness, examination by his own counsel was limited to the subject matter of his examination in chief. See Rule 43(b) of the Federal Rules of Civil Procedure↩ for the United States District Courts.
5. Sec. 5400 of the California Corporations Code provides: A corporation which is dissolved by the expiration of its term of existence, by forfeiture of existence by order of court, or otherwise, nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it, and enabling it to collect and discharge obligations, dispose of and convey its property, and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof.↩